[Crim. No. 1165.   Third Appellate District.—November 7, 1931.]

THE PEOPLE, Respondent, v. RONALD JEAN MEYER, Appellant.

S. Luke Howe and Howe, Hibbitt & Johnston for Appellant.

U. S. Webb, Attorney-General, and J. Charles Jones, Deputy Attorney-General, for Respondent.

THOMPSON (R. L.), J.—The defendant was found guilty of robbery and of a prior conviction of another felony. At the trial, he did not become a witness in his own behalf. It is now contended the evidence fails to identify him with the robbery or to support the judgment. It is also asserted the court erred in receiving in evidence three revolvers without sufficient proof connecting them with the crime with which the defendant is charged, and that the district attorney was guilty of prejudicial misconduct by calling the jury's

attention to the defendant's appearance, and in asserting that officer's individual belief in the guilt of the accused.

The story of this crime reads like a modern film melodrama. It was a professional performance. Frank Bechelli operated a roadhouse resort near Redding. About 12:30 in the morning of April 7, 1931, a lull occurred in the activity of business. It was a bright, moonlight night. The barroom was brilliantly lighted. It was deserted except for the presence of Bechelli, the proprietor, Sylve Aussem, his "housekeeper", and Jim Bell, a faithful adherent of the joint. Bechelli was decorated with a dazzling $450 diamond ring. Sylve also wore a valuable diamond ring and a diamond-studded wrist watch. Diamond lavalieres and eight or ten hundred dollars in cash were securely stored in a safe.

Sylve had just stepped out of the room to tuck her wire-haired fox terrier in bed. As she returned to the room a Husdon roadster roared up to the resort, and in walked three gallant musketeers each armed with a pair of guns. They were unmasked. Tex Rambo, who led the trio, was recognized as the "hombre" who favored the resort with a preliminary visit three weeks previous to this occasion. The defendant brought up the rear. Tex said, "Hello Syl, you see, I cum back". Noticing the display of guns, Sylve thought it was a practical joke, and laughed. Then the trio promptly proceeded to business. The defendant glowered and fiercely commanded the victims to "stick 'em up". He shouted, "This is no joke, we mean business, . . . turn over to the wall, and be quick about it". They then began to prod the victims in the ribs with their guns to accelerate a compliance with orders. Bechelli was a bit slow in acting upon his cue, so Tex jabbed him viciously and said, "Come on brown shirt, get over to the wall." They were speedily lined up facing the wall in true Capone etiquette. The defendant then ordered one of their number to get a wire clothes-line from outside, with which they securely bound the hands and feet of their victims. They were gagged. Sylve was tossed upon a bed in an adjoining room and a quilt was drawn over her head. Bell was similarly disposed of. Bechelli was thrown upon a Chesterfield couch in the front room and directed to turn his face to the wall. When he turned to take a look at the robbers, he was warned that a repetition of such conduct would make it necessary for them

to "plug him". He promptly obeyed, and exhibited no further curiosity in their operations.

The safe was opened and its contents were appropriated. The cash register was jimmied and looted. The diamond ring was torn from the finger of Bechelli with pliers so forcibly as to cut his finger and cause profuse bleeding. The diamond was removed from its setting. The ring was crumpled with the tweezers and thrown away. Sylve's ring was similarly treated. Her wrist watch was taken. Three slot machines were carried out and placed in the rumble seat of the machine, where they were covered with a quilt which was removed from a bed. Bechelli's revolver was discovered and taken. His car, which stood near the entrance, was disabled by cutting the wire connecting the electric starter. With a final warning to visit swift death upon "anyone who squealed on them", the robbers fled and entering their machine, they dashed down the highway at the rate of sixty or seventy miles an hour.

After the sound of the machine had died away, the victims regained their courage. Their bonds were loosened. Bechelli was released. He borrowed a car from an occupant of an adjoining cottage. Within a few minutes after the robbery occurred, he reached Redding and notified the sheriff of the commission of the crime. Messages were sent in every direction to adjacent cities. The officers of Chico, which is situated about seventy miles from Redding, upon receiving this notice, drove their car north a mile or two and parked it beside the highway, where they remained on watch for suspicious motorists. The robbers arrived about 3 o'clock in the morning, driving at a furious rate of speed. The officers signaled and tried to stop them, but failed. They recognized the Hudson car with its three occupants, and a quilt covering the contents of the rumble seat. They immediately started in pursuit of the culprits but were outdistanced and eluded. The robbers passed through Chico at the speed of an express train. A witness said he saw them driving south of Chico at a reckless rate of speed. Anticipating they were likely to be captured, they threw away their revolvers and changed their course westerly towards Willows. Three revolvers were subsequently found adjacent to the highway below Chico. One of them was identified by Bechelli from its serial number and caliber, as his own weapon. He so

testified. In an interview with the district attorney, which the defendant requested after his arrest, the following conversation occurred "Q. (By the district attorney). You fellows took an awful chance when you drove through the officers at Chico, didn't you? Why didn't you stop? A. We couldn't have stopped if we had wanted to, we were going too fast. If there had been a barricade there we would have gone right through it. . . . Q. After you got by, why did you throw the guns away? A. We thought they were hot on our trail, and we tossed the guns out as we thought we were caught, sure." These admissions were not denied by the defendant. The revolvers were sufficiently identified.

About 7 o'clock that morning the defendant Meyer walked into the "L. K. Garage" at Willows, and asked William Roberts, the foreman, to go out and get his car which was stalled on the highway about half way to Orland. The Hudson car was subsequently towed into the shop for repairs. It was a light green Hudson roadster. The engine had been ruined from excessive speed. It was found to be registered in the name of Evelyn Isabel Meyer, of Berkeley, who is the wife of the defendant. The stolen property was not discovered. The defendant's companions were not apprehended. There was some conflict regarding the color of the Hudson roadster which was seen at the roadhouse. Sylve was mistaken about saying she had previously seen the defendant at the roadhouse. It was Tex Rambo who had been there, and whom she had previously seen. These details are immaterial. Both Bechelli and Sylve testified unequivocally they clearly saw the unmasked face of the defendant in the full glare of the lighted room, and recognized him as one of the robbers. ■ The finding and identifying of Bechelli's revolver near Chico, and the admissions of the defendant to the district attorney are conclusive of his identity. There is, therefore, no merit in the contention that the identity of the defendant as one of the robbers was not established. The evidence is ample to support the judgment of conviction.

■ It was established that the defendant had been an inmate of Agnew State Hospital. His plea of "not guilty by reason of insanity" was voluntarily withdrawn by him, with his personal approval. The question of his insanity was not an issue in the case, and may therefore not be raised upon this appeal.

█ The district attorney is charged with prejudicial misconduct in calling the attention of the jury to the appearance of the defendant, since he was not a witness in his own behalf, and in asserting on his personal authority that the defendant was guilty. Both of these statements of the district attorney were indiscreet, inexcusable and highly prejudicial. In a case where there was any reasonable doubt of the identity of an accused person or of his guilt of the crime charged, these statements would require a reversal of the judgment of conviction. In the present case, at the request of the defendant, the challenged remarks of the district attorney were ordered to be stricken from the record, and the jury was repeatedly instructed to disregard them. Even this prompt and clear disapproval of the trial judge may not suffice to remedy the prejudicial effect of such conduct on the part of a district attorney, in a doubtful case. In this case, we feel there can be no possibility of a mistake regarding the identity of the defendant in this bold, flagrant participation in one of the most heinous crimes known to the law. Courts cannot afford to trifle with those who resort to the methods of highwaymen. No crime is more detrimental to the security of our homes or the safety of our governmental institutions. In spite of the misconduct of the prosecuting officer, we believe the record clearly shows there was not a miscarriage of justice in this case. We are authorized to uphold the judgment of conviction under the provisions of section 4½ of article VI of the Constitution of California.

The judgment is affirmed.

Preston, P. J., and Plummer, J., concurred.